IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 7, 2013

IN RE HOPE A. A.[1]

Appeal from the Chancery Court for Hamblen County
No. 2010618      James E. Beckner, Sp. Chancellor[2]

No. E2012-01209-COA-R3-PT-FILED-MAY 10, 2013

This case concerns the termination of the mother's parental rights. The subject child is the second born to the mother. The petitioner is a friend of the mother with whom the child has lived continuously for several years. We have determined that the record contains clear and convincing evidence to support terminating the mother's parental rights on the three grounds relied upon by the trial court: abandonment for failure to visit and to provide support and persistence of conditions. The record further supports the conclusion that terminating the mother's parental rights is in the child's best interest. Accordingly, we affirm the findings of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Lauren Armstrong Carroll, Morristown, Tennessee, for the appellant, Sheila A.

Beth Boniface, Morristown, Tennessee, for the appellee, Donna O.

Dale Darby, Morristown, Tennessee, Guardian ad Litem.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

[2]By designation of the Tennessee Supreme Court.

# OPINION

## I. BACKGROUND

The appellant, Sheila A. ("Mother"), has three children. After having her first child, Kayla, while living in Florida, Mother separated from that child's biological father and lived with an abusive boyfriend. The oldest child subsequently was placed with her father after Mother physically abused her and was convicted of the felony of culpable negligence.[3] After Mother's incarceration ended, she entered into another abusive relationship that resulted in her pregnancy with Hope ("the Child") (d.o.b. 9/12/05), the child at issue in this appeal.[4] After that relationship ceased, Mother found herself homeless with no money. For a period of time, she was living behind a convenience store. Eventually, Mother borrowed some money to leave Florida and traveled to this state to stay with her mother.

Due to the felony conviction, Mother was only able to reside with her mother in a government housing unit in Morristown for a couple of weeks. Mother then became acquainted with Donna O. ("Friend") and her husband (collectively, "Friends").[5] Mother moved into Friends' furnished basement during her pregnancy and remained there for several months after the birth of the Child. As Mother had arrived in Tennessee with very few possessions, Friends provided everything for her. Mother was taken to medical appointments and given food and spending money. After the Child's birth, Friends noted parenting difficulties, as Mother experienced difficulty bonding with the Child and had problems controlling her temper. Eventually, Friends moved the Child's crib upstairs with them due to Mother's screaming and refusal to feed the Child.

Mother and the Child eventually left Friends' home, but the close relationship was maintained. The couple continued to provide financial support to Mother. Friend essentially had daily contact with Mother and the Child, often caring for the Child for long periods due to Mother's struggles with her mental health.

In March 2009, Mother married Brian Doerer. Their marriage was unstable – Mother stayed out all night, did drugs while caring for the Child, resorted to physical violence against her husband, and slept a lot. She would anger easily, scream, and bang her head against the

---

[3]At the trial in this case, Mother testified regarding the incident as follows: "I was trying to teach [oldest child] her ABC's, and I was having a difficult time getting her to say the word cat, and I proceeded to hit her on her leg with a belt, and I left whelps on her leg and stuff."

[4]The rights of the unknown father are not at issue in this appeal.

[5]Mr. O. has since passed away.

-2-

wall. At trial, Mr. Doerer testified that Mother, as a parent,

> could have done better. You know, I'm not saying she was terribly horribly
> treating [the Child], but she wouldn't bathe her and I'd get on her about that.
> I just thought . . . [The Child]'s got beautiful long hair and it should be
> washed and taken care of. I taught [the Child], well, I'm sure [Mother] did,
> too, but you know when we were married and we were living together, I made
> a little stool for [the Child] to be able to reach – she wouldn't wash her hands
> when she'd go to the bathroom, so you know I made sure she did that, because
> it was just something that I felt . . . wasn't being taught to her.

By July 2009, however, Mother had left Mr. Doerer and was again homeless. Rule violations resulted in her eviction from three homeless shelters.[6] A few months after leaving her husband, Mother left the Child with Friend to live full-time.[7]

In December 2009, the Department of Children's Services ("DCS") petitioned the juvenile court and was awarded an order placing the Child with Friend due to dependency and neglect. The petition contained three allegations:

> 1. Mother was homeless and was recently evicted from the homeless shelter
> for failing to follow house rules;
>
> 2. Mother did not have the means to provide her child with a safe and stable
> home and had allowed her minor child to live with a family friend, Donna
> O[.]; and
>
> 3. Mother suffers from unspecified mental health diagnoses, for which she is
> currently prescribed benzodiazepines and amphetamines and these illnesses
> render her unable to care for the child adequately, especially as mother has
> been noncompliant with recommended therapy.

From February 2010 until July 2010, the record reveals that Mother's whereabouts were unknown. It appears she lived in her car for a period of time. On April 14, 2010, the juvenile court adjudicated the Child dependent and neglected and awarded Friend custody.

In July 2010, Mother ended up in a Knoxville homeless shelter. A month after her

---

[6]Cursing at workers and buying alcoholic beverages.

[7]Friend asserts the Child has lived with her continuously since October 23, 2009.

arrival at the shelter, Mother entered into a relationship with Willis Johnson, a co-tenant at the shelter, and became pregnant with his child.

On December 8, 2010, Friend filed a petition to terminate Mother's parental rights and to adopt the Child. The alleged grounds were abandonment for willfully failing to visit; abandonment for willfully failing to provide support; abandonment by neglecting to remedy the dependency and neglect conditions; no substantial completion of the permanency plan; and persistent conditions.

After the first of the year, Mother and Mr. Johnson moved into a rent-controlled apartment together.[8] Their relationship, however, was volatile and violent. According to Mother, Mr. Johnson choked her while she was pregnant. Mr. Johnson, on the other hand, claims Mother attacked him while he was sleeping and holding their newborn. At trial, he testified observing Mother "sling" their two-week-old daughter. He further related that Mother snorted pills and smoked marijuana while caring for her youngest child. Mother admitted that she had attempted to run over Mr. Johnson with her car. The relationship terminated in February 2012, but Mother remained at the apartment with her youngest daughter and was still there at the time of trial.

On May 3, 2012, the trial court heard the petition to terminate and adopt. The grounds upon which Friend proceeded were abandonment for willful failure to provide child support, abandonment for willful failure to maintain contact, and persistent conditions.

Of record is a written statement from Mother that was submitted to the trial court:

When I received the Civil Summons on the 21st day of January I was to give an answer to the complaint within 30 days of the Summons being served to me. I was not aware of how to answer the Summons. I went to [Friend's attorney]'s office thinking I had to respond to her. Her secretary informed me that I had to respond to the courts and the response had to be written up with a lawyer. Since I could not afford a lawyer, which I told her I could not she said, I could get the paperwork at the Court House and write up the response myself. I thanked her and went to Legal Aid to see if they could help me. They said they did not do custody cases. I went to the Court House in Morristown and asked for the paperwork like I was informed. I was told that I could not have the paperwork unless a lawyer was doing the response. I asked the ladies, "I can not respond to this unless I have a lawyer?" [T]he ladies said, "No," meaning that I could not respond if I did not have a lawyer.

---

[8]The housing was procured at a reduced rate due to Mr. Johnson receiving federal disability benefits.

I was given the Yellow Pages to look for a lawyer. After calling several of them I was told I had to pay a couple thousand dollars in advance. I did research at the library for a pro bono lawyer and they too needed hundreds of dollars to start my case. At that time I was not working and could not afford it. I called my friend Anthony in Florida for help and some girlfriends but they could not help me. Thus, because of my failure to respond in a timely manner an order allowing final judgment by default has been requested for the Petitioner. When I received the Summons I knew that I had to respond. I love [the Child] and care deeply for her and want her to come home with me, her mother. I have missed precious valuable times with her and I am willing to do everything and anything to be with her again. I miss her so much, and I know that she misses me. I am not a perfect mother and I will never be but, I have never mistreated or abused her in any way whatsoever. When I was living with [Mr. Doerer] I was deeply depressed. In fact when I separated from my husband, it was due to the fact that as soon as we were married he became mentally, physically and verbally abusive towards me. He was also mentally and verbally abusive towards [the Child], this though was never mentioned to the Judge at the last hearing as the reason why I became homeless. After months of said abuse I did not want to subject her or myself to this treatment anymore. I left [the Child] in the care of [Friend] until my living and mental situation was better. I did not neglect or abandon my child[;] I did not want her to be in an unstable living condition. I did not call or visit [the Child] for a period of no longer than 3 weeks because I was living in my car and I was very depressed. I did not want her knowing my situation and wanted to protect her from the harsh realities of life. I was, on the other hand, still working at Big Lots throughout the whole year even though I was in my car or living in shelters so my whereabouts were known to [Friend], even though I had no formal address. As regards to the Motion and responding specifically to line 6: At the time of this hearing I was still living in my car and had no gas to make it to the hearing. As regards to line 10: My visitations with my daughter [the Child] have not been mere token visitations but, special quality times where we get to play, draw, watch television or talk about the week[']s events. I look forward to being with her every chance that I can get. As to line 11: I have not made any child support payments but, I have bought her clothes, shoes and toys whenever I can. As to line 12 on January 1st 2011 my boyfriend and I moved into a 2 bedroom apartment in Jefferson City to be closer to [the Child]. We have a bedroom waiting for her when she comes home. As far as my Mental Health is concerned I have been seeing a Psychologist, Dr. Jeffrey Munson since February 22nd 2011. . . . I have also been hired at the American Book Company after passing a urinalysis drug test

and am awaiting the[ir] phone call. All this shows that I have taken the steps to remedy the problems described in the Motion. Your Honor please do not terminate my parental rights and responsibilities. I am now more than willing and able to provide a safe, stable and loving environment for my daughter [the Child.]

Upon conducting the hearing and reviewing all the evidence of record, the trial court noted in its memorandum opinion, inter alia, as follows:

Petitioner became very concerned about how the child was treated by the mother because Respondent would scream at the baby and throw things, causing Petitioner to take the baby upstairs. Respondent's behavior got worse but then seemed to improve. It was agreed that the Respondent would move to her own apartment but was warned that the Department of Children's Services would be called if she harmed the child o[r] failed to care for her.

During this time, Respondent was being treated at Cherokee Mental Health for a bi-polar condition with psychosis. . . . These records show a persistent behavioral pattern of depression, hearing voices, panic, violence to herself, and impulsiveness. There are several periods where she seems to be improving but reverts back to her psychotic behavior.

While away from [Petitioner's] residence Respondent married Brian Doerer, to whom she is still married, but hasn't lived with in some time. Mr. Doerer . . . testified that Respondent used illicit drugs while they were together and that there was a great deal of violence in which Respondent was most often the aggressor. He testified Respondent would stay out all night and that she exchanged "pills" with neighbors, a fact he learned from the subject child. . . . He says the Petitioner frequently cared for the child while he was living with the Respondent.

* * *

In 2010, while in a homeless shelter in Knoxville, Tennessee, the Respondent became sexually involved with Willis Johnson who is the father of her third child. They separated in November 2011. Mr. Johnson, who has had a rather sordid past, testified that the Respondent was emotionally unstable, used illicit drugs when they were together and was under the influence of drugs when she visited the subject child. He testified his relationship with the Respondent was violent and abusive. He said the Respondent slung his daughter around when

-6-

that child was just two weeks old, in September 2011. He further stated that Respondent attacked him when he had the baby in his arms and, on another occasion, tried to run over him with a car while the baby was with him.

Since the subject child has been with the Petitioner, the Respondent has never engaged in more than t[o]ken visitation. . . . Her visitation has been pitiful. The infrequent visits have averaged one hour or less. While visiting she has often spent time texting and has at times been under the influence of drugs. There have always been excuses why she could not make visitations but none are credible. She seems to have been able to go other places. She posted pictures on Facebook with boyfriends at the mall. Respondent's focus is on herself and not the subject child.

The Respondent continues to be in denial. She is a person who life has not treated well, but she simply cannot alter her conduct for any substantial period of time.

She testified that she has turned her life around within the past 12 months. However, the facts belie that assertion. She is living with a new boyfriend and her third child in an apartment in Jefferson City and working. Yet, within the past two weeks her electricity was cut off and she had to get the pastor of a church to raise over $300.00 to have it turned back on.

She testified that the psychologist she is now seeing is in a large part responsible for her new life but after seeing him on April 1, 2012, she has cancelled the last two appointments. . . .

Even to this date she has never paid the Petitioner or anyone else any money for the support of the child since 2009. She has on rare occasions directly bought an article of clothing or a toy for the child.

DCS has tried to rehabilitate the Respondent to be able to move to return custody to her. Respondent has not been willing to comply with the directions and requirements of the Juvenile Court. . . .

. . . The Guardian ad Litem recommends to this Court that the child should not be returned to the Respondent because, among other things, she has never done anything substantial for the child. There has been a persistent pattern of bad choices, and her decisions regarding the child have not been in the child's best interest[ ].

On the other hand, the Petitioner is the only real mother the child has ever known.  She has provided for all the child's needs, has her happy and doing well in a stable environment, has her doing well in school, has her involved in constructive social activities and has her taking piano lessons.  [Petitioner] is a good woman, morally and ethically upright, intelligent, and one who obviously loves this child as her own.

It can be truthfully said that being with [Petitioner] is the best thing that ever happened to this child.

It can conversely be said that, at this point in time, the worst thing that could happen to the child would be to take her from [Petitioner].

The trial court found further as follows:

This Court finds as a matter of law by clear and convincing evidence that the Respondent, Sheila A[. ], has abandoned the child, Hope A[. ] A[. ], within the definitions of [Tennessee Code Annotated section] 36-1-102, in that she, for a period of 4 consecutive months immediately preceding the filing of this petition, willfully failed to visit and willfully failed to support the child.  Nothing more than "token" visitation or support was ever attempted.  The visitation was of such an "infrequent nature" and "of such short duration as to merely establish minimal or insubstantial contact with the child," [Tennessee Code Annotated section] 36-1-102(1)(C).  Support was non existent.

The Court further finds as a matter of law, by clear and convincing evidence that the Child has been removed from the Respondent's home by an order of a court for more than 6 months and the conditions causing the removal still persist with little likelihood of remedy.  [Tennessee Code Annotated section] 36-1-113(g)(1) & [Tennessee Code Annotated section] 36-1-113(g)(3)(A) & (B).

The Respondent's mental condition still raises serious issues as to her ability to safely care for the child.

The father of the child is not known.  He was duly served with publication in the Knoxville News Sentinel on December 28, 2010, January 4, 2011 and January 18, 2011, but has failed to respond, plead or otherwise defend timely as required by law, and is properly before the Court for the purpose of this action.

Therefore the Court finds that the parental rights of the mother, Sheila A[. ], and the Father, John Doe, be terminated pursuant to the provisions [Tennessee Code Annotated section] 36-1-113 and that said termination is in the best interest of the child, Hope A[. ] A[. ]. . . .

Mother filed a timely appeal.

## II.  ISSUES

We restate the following issues raised by Mother in this appeal:

1.  Whether the trial court erred in finding that Mother had abandoned the Child by willfully failing to visit with the Child for the four-month period of August 8, 2010, to December 8, 2010.

2.  Whether the trial court erred in finding that Mother abandoned the Child by willfully failing to provide child support for the four-month period at issue.

3.  Whether the trial court erred in finding that Mother had failed to rectify the conditions that resulted in the Child's removal from Mother as a dependent and neglected child.

4.  Whether the trial court erred in finding that it was in the Child's best interest to terminate Mother's parental rights.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).  This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).  "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent."  *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)).  "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be

correct.  *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).


## IV.  DISCUSSION

## A.  GROUNDS FOR TERMINATION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights.  The applicable provisions read as follows:

> **36-1-113.  Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> (b)  The prospective adoptive parent . . . shall have standing to file a petition . . . to request termination of parental or guardianship rights . . . .
>
> (c) Termination of parental or guardianship rights must be based upon:
>
> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> * * *
>
> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :
>
> > (1)  Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
> >
> > (2)  There has been substantial noncompliance by the parent or

-11-

guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(a) - (g)(3)(A)-(C).[9]  The party petitioning for termination carries the burden of proof.  *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).  The requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away."  *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## WILLFUL FAILURE TO SUPPORT

Pursuant to Tennessee Code Annotated section 36-1-102(1)(A) and Tennessee Code Annotated section 36-1-102(1)(D), Friend alleges Mother has abandoned the Child by willfully failing to support and willfully failing to make reasonable payments toward the Child's support.  Friend avers that any support or payments that have been made constitute token support as defined in Tennessee Code Annotated section 36-1-102(1)(B).

---

[9]Recent amendments have not modified provisions applicable in this case.

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), we addressed the concept of "willfulness":

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . .
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must inter intent from the circumstantial evidence, including a person's actions or conduct.

182 S.W.3d at 863-64 (internal citations omitted). *In re M.J.B.*, 140 S.W.3d 643, lays out a test for failure to support:

> (1) that the parent is aware of his or her duty to support; (2) that the parent is able to provide financial support, either through income from employment or qualification for government benefits; and (3) that the parent has voluntarily

-13-

and intentionally chosen not to provide financial support without a justifiable excuse.

Mother claims that the record does not contain clear and convincing evidence that she knew of her duty to support, had the ability to provide support, made no attempts to support, and did not have a justifiable excuse for not providing any support. She observed that no child support action was filed against her with regard to the Child. She asserts there was no proof that she was informed of her obligation to pay child support when DCS was involved. Mother further contends that during the relevant four-month time period, there is no proof that she had the ability or means to provide child support. According to Mother, during that time frame, she was living in a homeless shelter, did not have a job, and did not have reliable transportation. She also argues there is no proof that during the relevant period she intentionally did not obtain employment. She does admit that she was under the impression that Friend did not need any money, so she did not concern herself with monetary support and only provided what toys, clothes, and such she could afford for the Child.

Under the facts of this case, the time period under consideration would be from August 8, 2010, until December 8, 2010. Mother had begun her romantic relationship with Mr. Johnson. Around the time the Child started school in 2010, Mother bought her pink and black sneakers and an outfit. That is the only support Mother provided during the requisite four-month period. She gave the Child no financial assistance.

The law in this state is clear that a parent has a duty to support a child, regardless of whether there is a prior court order requiring such. *In re M.A.C*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008); Tenn. Code Ann. § 36-1-102(1)(H). Mother admits she is aware that children require food, shelter, and housing. Thus, the absence of a court order to pay support does not justify Mother's actions.

Additionally, Mother testified that she was capable of working, that working made her feel good, and that she could have gotten a job during the time period between August 8, 2010, and December 8, 2010. She had transportation available at the shelter but neglected to utilize it to obtain employment in order to better her situation. Clearly, it was her own free will that kept her from doing so. Friend has established that Mother made no attempt to pay support and lacked a justifiable excuse. The evidence clearly and convincingly supports the trial court's holding that Mother's failure to support was willful.

## WILLFUL FAILURE TO VISIT

It is alleged that Mother abandoned the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(A). That provision provides that if a respondent has willfully failed to maintain contact with the minor child for a period of four consecutive months or more immediately preceding the filing of the petition to terminate and if any visitation that respondent may have had with the minor child has been merely token visitation as defined in Tennessee Code Annotated section 36-1-102(1)(C), then the respondent's rights to parent the minor child may be terminated. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re M.J.B.*, 140 S.W.3d at 654. Again, the requisite four-month period under consideration started on August 8, 2010, and ran until December 8, 2010.

Mother asserts that Friend did not prove by clear and convincing evidence that she willfully failed to visit the Child. According to Mother, during the applicable period, she struggled with homelessness, did not have adequate transportation, and was not employed. Mother contends that she did not visit the Child in August or September of 2010 due to the fact that she was living in the Knoxville shelter and did not have a vehicle. She claims that on multiple occasions she asked Friend if the location of the visits could be changed, or if Friend would bring the Child to Knoxville. She admits, however, that she found the money to fly to Florida during the time period and spent nearly a month visiting with her oldest daughter. Mother notes that she did maintain telephone contact.

The record reveals that during the statutory four-month period, Mother only visited five times for a total of almost ten hours. During some visits, she was under the influence of drugs. According to witnesses, during the relevant period, Mother had an automobile but did not use it to visit the Child. She apparently missed one visit in order to get her hair fixed. As noted previously, her lack of employment was of her own choosing. We find it noteworthy that despite the fact that Mother was provided a schedule of all of the Child's activities and school functions, she did not take the opportunity to participate in any.

Failure to visit is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or constitutes a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). In this case, the evidence clearly and convincingly supports the trial court's holding that Mother's failure to visit was willful.

# PERSISTENT CONDITIONS

Another ground alleged by Friend is persistent conditions. As earlier noted, that ground provides as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A-C).

Mother contends that she now has made tremendous strides in her life. At the time of trial, she claimed she had a full-time job, housing, reliable transportation, a valid driver's license, and car insurance. She admits that she had been diagnosed with borderline personality disorder and depression, but asserts she regularly attends therapy.

A problem condition for Mother has been housing. She testified at trial regarding her history of homelessness. At the time of the trial, Mother was still residing in the house she obtained with Mr. Johnson in January 2011, but admitted she had to borrow $325 from a church to have her electric service restored. She also informed her psychologist that her cable and Internet services had been shut off and that her phone soon would be disconnected. Mr. Doerer was helping her out by fixing the brakes on her car. Accordingly, the record clearly reveals that Mother continues to rely on the assistance of others and would be financially unable to maintain a home with two minor children by herself.

The other problem area for Mother concerns her mental instability. Mother sought psychiatric treatment at Cherokee Mental Health Systems from April 2006, through June

2010. Notes from those visits reveal a long history of mania with paranoia, impulsivity, sleeplessness, hearing voices, irritability, explosiveness, and drug use. Mother was manic and homicidal in July 2006, and was hospitalized at an inpatient mental health facility. In September 2006, Mother reported increased mania with poor impulse control, slamming her head on the floor, and feeling out of touch with the Child. In January 2007, Mother noted that she was sleeping more, not caring for the Child, poorly motivated, fatigued, crying, irritable, shutting out others emotionally, and increasingly depressed. Again in July 2007, Mother was experiencing poor hygiene, poor motivation, depressed crying, and impulsivity. Similar conditions were still indicated in June 2010, where Mother reports more mania, hitting head, impulsive spending, and a panic attack at work.

The February 2011 intake interview of Dr. Munson noted that Mother hears voices and hits her head to get the voices out, has blackouts during intimacy with men, hallucinates and has delusions, has had two panic episodes, and nearly overdosed. She reported fantasies of killing her boyfriends, along with vivid and specific dreams. Mother complains of loneliness, no support system, inability to stop crying, and detachment. In April 2011, Mother complained of abandonment issues, intense unstable relations, identity disturbances, impulsivity, suicidal thoughts and threats, and emotional lability and intense anger with episodes of suspicion, mistrust and paranoia. In March 2012, Mother reported depression and loneliness. Dr. Munson diagnosed her with depressive disorder and borderline personality disorder.

Mother's mental issues have also led her to engage in unhealthy relationships and to abuse drugs throughout her lifetime. She has a lengthy track record of associating with unstable men. She acknowledged that her drug use started as a teenager and continued intermittently throughout her adult life. The evidence of record supports the conclusion that Mother consistently used marijuana and pills and arrived at visits with the Child "high." Mother admitted to Dr. Munson that she tried opiates, orally and nasally, when homeless to escape and because she likes to get high. The record before us supports the trial court's determination that the same conditions in existence when the Child left Mother's custody persist to this day.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

-17-

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother asserts that there are several factors, in addition to those listed in the statute, that should be taken into consideration. She states that she has made a significant adjustment of her circumstances, conduct, and conditions. She notes that she has resided in a safe and appropriate home for almost two years, has maintained employment, has sufficient income to provide for her family, and has achieved mental health stability.

The proof clearly reveals that termination of Mother's rights was in the Child's best interest. At trial, Mother had discontinued her mental health counseling even though she has borderline personality disorder. She has a history of severe mental health issues, violent behavior, erratic mood swings, homelessness, and illegal drug use. Mother has not supported or maintained regular visitation with the Child and has no meaningful relationship with this daughter. The Child has bonded with Friend and it would be detrimental to the youth to remove her from her current home.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for such further proceedings as may be necessary. The costs of the appeal are taxed to the appellant, Sheila A.

_____
JOHN W. McCLARTY, JUDGE

-19-